IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| DEMETRA MILLADGE<br>16828 Nuttal Oak Place<br>Woodbridge, VA 22191<br><br>*Plaintiff,*<br><br>v.<br><br>OTO DEVELOPMENT, LLC<br>100 Dunbar Street, Suite 402<br>Spartanburg, SC 29306<br><br>**Defendant.** | FILED<br>2014 FEB 21 P 2: 22<br>CLERK US DISTRICT COURT<br>ALEXANDRIA, VIRGINIA<br><br>Case No.: 1:14CV194-CMH-JFA |

## COMPLAINT

Plaintiff Demetra Milladge hereby submits this Complaint against Defendant OTO Development, LLC, and states as follows.

### Parties

1. Plaintiff Demetra Milladge ("Ms. Milladge" or "Plaintiff") is a citizen of the United States and a resident of Prince William County, Virginia.

2. Defendant OTO Development ("Defendant" or "OTO Development") is a hotel development and hospitality management company based in South Carolina, with offices in Virginia, and an employer within the meaning of 42 U.S.C. § 1981.

### Jurisdiction and Venue

3. The Court has jurisdiction over Plaintiff's federal discrimination claims pursuant to 28 U.S.C. § 1331 and the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981.

4. Plaintiff has exhausted all administrative prerequisites for filing suit.

1

5. Venue is proper in this court pursuant to 28 U.S.C. Section 1391(b) in that all or some of the events or omissions giving rise to Plaintiff's claims occurred in this judicial District.

**Factual Allegations**

6. Ms. Milladge, an African American, was hired by OTO Development as an Assistant Director of Sales on December 5, 2009. She was promoted to the position of Director of Sales of the Sheraton Herndon Dulles Airport Hotel ("Sheraton") and the Hyatt Place Herndon-Dulles Airport East Hotel ("Hyatt Place") in April 2011 and worked in this capacity until her termination on August 16, 2013. As a Director of Sales, Ms. Milladge was responsible for managing the Sales Department at the Sheraton and the Hyatt Place. Throughout Ms. Milladge's employment, she was a valued contributor and consistently received satisfactory performance evaluations. Ms. Milladge received a bonus for her performance in August 2012 and February 2013 based on the RevPar Index, Guest Services Scores, Group Revenue Goals, and any additional revenues for the Sheraton and Hyatt Place. In late May 2013, less than three months prior to her termination, Ms. Milladge received an annual merit increase of two percent of her salary due to her performance.

7. Ms. Milladge reported to the general managers of the Sheraton and Hyatt Place. Michael Estes (Caucasian) was the General Manager of the Hyatt Place until February 2013, and Jill Ward (Caucasian) was hired as Mr. Estes' replacement in May 2013. Patrick Campbell (Caucasian) was the General Manager of the Sheraton, until June 2013 when he was replaced by Jim Keely (Caucasian).

8. In late February 2013, Jason Poynter (Caucasian) was hired as the Regional Director of Sales-OTO Development. Mr. Poynter's duties included collaborating with all Directors of Sales within his region and discussing and developing sales strategies for their assigned hotels. He had

supervisory powers over all Directors of Sales, such as the authority to provide goals, assign daily duties, issue disciplinary actions to Sales Department team members, and handle personnel issues.

9. From the start of his employment, Mr. Poynter subjected Ms. Milladge to disparate treatment and a hostile work environment based on her race, and disparate treatment. He regularly spoke to Ms. Milladge in a condescending tone and manner. For instance, during a meeting in early April 2013, Mr. Poynter told Ms. Milladge, "You have to put your big girl panties on" and "You have to have a backbone." Also in April 2013, Mr. Poynter solicited feedback regarding the needs of Ms. Milladge's Sales Department. When Ms. Milladge began to answer, he cut her off, stating, "I've already heard that." Mr. Poynter again spoke over Ms. Milladge during a meeting with Mr. Ron Alfera (Caucasian), the Regional Director of Management. Mr. Alfera asked Ms. Milladge a question, and Ms. Milladge started to reply when Mr. Poynter interjected in a loud and demanding tone, "Answer the question." Mr. Alfera responded, "She was answering the question." Members of Ms. Milladge's sales team, including Ashlee Watson (mixed race African American and Caucasian), Heidi Milan (Hispanic), and Deborah Swiszcz (Caucasian), commented about how Mr. Poynter would interrupt Ms. Milladge, and questioned, "Do you realize that he talks to you in a very demeaning way?" They indicated that Mr. Poynter's tone was "unprofessional" and "demeaning" when addressing Ms. Milladge and said, "I don't know how you stand for it." Mr. Poynter also inaccurately suggested to Ms. Milladge's team on several occasions that the team did not bonus. Each time, when Ms. Milladge attempted to correct him, Mr. Poynter disregarded her statements.

10. In addition, Mr. Poynter sent Ms. Milladge rude and degrading emails. In May 2013, Mr. Poynter accused Ms. Milladge of not soliciting Airport Accommodations business when

American Airlines experienced travel delays and wrote, "You need to be on top of this." Ms. Milladge informed Mr. Poynter that the Front Desk staff of the Sheraton and the Hyatt Place had decided to turn down airline business due to the inconvenience of processing travel vouchers. She notified Mr. Poynter that she found his email to be condescending and requested he modify the tone of his emails. Mr. Poynter replied, "You may not like my condescending emails, but you had better get used to them."

11. Mr. Poynter appeared unwilling to collaborate with minority staff and preferred to interact with Ms. Milladge's Caucasian subordinate, Ms. Swiszcz. Although Ms. Milladge was responsible for developing sales strategies and planning trips to visit clients, Mr. Poynter refused to cooperate with her and, instead, approached Ms. Swiszcz to discuss these tasks. Further, he contacted Ms. Swiszcz with inquiries related to the client accounts of Ms. Swiszcz's minority colleagues, Corporate Sales Managers Margarita Castillo (Hispanic) and Ms. Milan. On multiple occasions, Ms. Milladge reminded Mr. Poynter that he should speak with Ms. Castillo and Ms. Milan to discuss their client accounts, but he disregarded her suggestion and called them "green" or inexperienced. In addition, Mr. Poynter excluded Ms. Castillo and Ms. Milan from corporate department meetings that he invited Ms. Swiszcz to attend.

12. Mr. Poynter expected Ms. Milladge to adopt a subservient role towards him by deferring to his judgment without question or comment. For example, Mr. Poynter criticized Ms. Milladge by comparing her to the only other African American Director of Sales in Mr. Poynter's region, Waneko Devo. Mr. Poynter said, "[Waneko] always gets on board. She does everything I ask her to do."

13. Shortly after he began employment at OTO Development, Mr. Poynter started to encourage Ms. Milladge's primary managers to terminate her. In April 2013, he openly

advocated replacing Ms. Milladge by suggesting to Mr. Campbell that Ms. Swiszcz be promoted and assigned Ms. Milladge's duties of managing the sales departments of the Sheraton and the Hyatt Place. Mr. Poynter often declared that Ms. Swiszcz should be working on the team's airline business, a core component of Ms. Milladge's responsibilities, rather than Ms. Milladge. In approximately April 2013, he suggested to Ms. Swiszcz that Mr. Poynter was considering attempting to terminate Ms. Milladge. On multiple occasions, Mr. Poynter informed Ms. Milladge that if they could not get the hotels turned around, either Ms. Milladge or Mr. Poynter would likely be terminated.

14. Mr. Poynter reprimanded Ms. Milladge for failing to perform duties that were not within the scope of her employment. In late April 2013, Mr. Poynter admonished Ms. Milladge for not assisting the general managers forecast numbers, even though Mr. Campbell informed Ms. Milladge that forecasting was not a part of her responsibilities. No other Directors of Sales helped forecast numbers, and Mr. Poynter did not chastise Caucasian Directors of Sales in this manner.

15. On May 31, 2013, Ms. Milladge was issued a performance appraisal for the rating period from January 1, 2012 to December 31, 2012. The evaluation rated Ms. Milladge's overall performance as "Needs Improvement." Although Mr. Campbell issued Ms. Milladge the 2012 unsatisfactory performance appraisal, all negative feedback in the evaluation was provided by Mr. Poynter, even though Mr. Poynter did not have the authority to evaluate Ms. Milladge's performance and had not been employed by OTO Development during the rating period. Mr. Poynter did not provide any input into the performance evaluations of other Directors of Sales.

16. The 2012 performance evaluation contained many inaccuracies and misrepresentations, criticizing Ms. Milladge's performance in these "Core Competencies": "Drive for Results",

"Motivating Others", "Time Management", and "Perseverance." For instance, the evaluation suggested that Ms. Milladge's performance was lacking in the "Perseverance" category because she needed "to examine reports closer for accuracy." However, neither Mr. Campbell nor Mr. Poynter was able to provide any example of an instance where Ms. Milladge sent out an inaccurate report. Also, within the "Drive for Results" category, Mr. Poynter reproached Ms. Milladge for entering fewer than forty-five sales calls per week, even though Ms. Milladge provided Mr. Poynter with documentation proving that Mr. Poynter's predecessor had set the team's goals at forty sales calls per month and that Ms. Milladge had met this requirement every month.

17. In or around early August 2013, the President of OTO Development, John Anderson, commented in a conference call that OTO Development needed proper documentation to terminate Ms. Milladge because, otherwise, Ms. Milladge "could come back and sue us for wrongful termination because she is African American and over forty (40) years old."

18. On August 16, 2013, Mr. Keely, Ms. Ward, and Mr. Poynter presented Ms. Milladge with a letter terminating her, even though Mr. Keely had only been working for OTO Development for approximately three weeks. The termination letter indicated that Ms. Milladge was terminated due to the following behaviors, performances, and/or incidents: "Revenue v. Budget below goal", "RevPAR Index below goal", "Sales Activities below goal", "[n]o improvement in key metrics since performance appraisal", "[s]ignificant managerial issues and breach of confidentiality", and "STR report performance through 8/11/13 ranked both hotels last in competitor sets." The letter noted that Ms. Milladge had previously been warned of her allegedly deficient behavior and/or performance via a "[p]erformance appraisal for 2012 [that]

noted deficiencies", "[c]ounseling [on] 6/4/13 regarding managerial issue [sic]", and a "written warning [on] 7/26/2013."

19. All information identified in the termination letter was provided by Mr. Poynter, and the letter was rife with fabrications and inaccuracies. Contrary to the assertion in the termination letter, Ms. Milladge did not receive counseling regarding managerial issues on June 4, 2013 or any other day. Also, Ms. Milladge met the required number of sales calls every week. In addition, Ms. Milladge never breached any duty of confidentiality, and her July 26, 2013 reprimand was a contrived attempt at building a case for terminating her. Next, the termination letter falsely affirmed that both the Sheraton and the Hyatt Place were ranked last in competitor sets through August 11, 2013 according to STR report performance ratings, even though the Sheraton consistently ranked between four and five out of seven. The Hyatt Place ranked between one and three out of ten hotels throughout 2012 and ranked between one and six out of ten in 2013. As of July 2013, the Sheraton was ranked second out of seven according to STR report performance ratings. Further, the General Managers are solely responsible for responding to questions regarding STR report performance ratings, and a General Manager's job performance rating and merit increase are based on the STR report performance ratings.

20. Lastly, the termination letter inaccurately pronounced that the hotels had not met their "RevPAR Index" or "Revenue v. Budget" goals. In fact, Mr. Poynter informed Ms. Milladge on August 12, 2013 that the Sheraton had made its RevPAR Index goal. The Hyatt Place missed its RevPAR Index goal by three percent, a deficit that is not unusual and has not been used as a basis for terminating other employees. Both the Hyatt Place and the Sheraton usually met their "Revenue v. Budget" goals, only occasionally missing their budgets by between $10,000 and $15,000. The largest deficit experienced by either hotel occurred in July 2013 when the

Sheraton missed its budget by $35,000. In contrast, hotels managed by Director of Sales Sean Flynn (Caucasian) frequently missed their budgets by between $100,000 and $150,000 and missed their RevPAR Index goals by as much as ten percent. Rather than facing immediate disciplinary action, Mr. Flynn was placed on an action plan, provided concrete guidance on how to improve his performance, and given a reasonable period of time to improve the performance of his hotels before facing termination. After receiving multiple warnings and chances to improve his performance, Mr. Flynn was terminated by his General Manager of nearly two years. Mr. Poynter was not present when Mr. Flynn was terminated, nor did he provide input into Mr. Flynn's termination.

## COUNT I

### Violation of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981
### (Hostile Work Environment)

21. Plaintiff incorporates by reference paragraphs 1 through 20 as though set forth fully herein.

22. The Civil Rights Act of 1866, 42 U.S.C. § 1981 provides that all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts as is enjoyed by white citizens and prohibits an employer from discriminating against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment because of such individual's race.

23. A hostile work environment is a form of prohibited employment discrimination where the employee is subjected to a work environment permeated with ridicule and humiliation and/or subjected to adverse action that substantially alters the work environment because of that employee's race, national origin, and/or age, and/or because the employee complained of discriminatory treatment.

24. Defendant and through its agents knowingly and intentionally engaged in unlawful discrimination when it subjected Plaintiff to a discriminatory and retaliatory hostile work environment in the form of verbal harassment and harassment via email, discriminatory assignments, efforts to undermine her authority, discriminatory evaluation of her performance, and termination based on her race and because she complained of discriminatory treatment.

25. As a result of such acts, Plaintiff has suffered damages.

## COUNT II

### Violation of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981
### (Race Discrimination)

26. Plaintiff incorporates by reference paragraphs 1 through 25 as if fully stated herein.

27. The Civil Rights Act of 1866, 42 U.S.C. § 1981, provides that all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts as is enjoyed by white citizens and prohibits an employer from discriminating against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment because of such individual's race.

28. Defendant and through its agents knowingly and intentionally engaged in unlawful discrimination when it subjected Plaintiff to disparate treatment in the form of verbal harassment and harassment via email, discriminatory assignments, efforts to undermine her authority, and discriminatory evaluation of her performance and termination based on her race.

29. As a result of such acts, Plaintiff has suffered damages.

## COUNT III

### Violation of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981
### (Retaliation)

30. Plaintiff incorporates by reference paragraphs 1 through 29 as if fully stated herein.

31. The Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 prohibits employers from taking adverse action against an employee who complains of discrimination.

32. Defendant and through its agents knowingly and intentionally engaged in unlawful discrimination when it subjected Plaintiff to a discriminatory and retaliatory hostile work environment in the form of verbal harassment and harassment via email, discriminatory assignments, efforts to undermine her authority, discriminatory evaluation of her performance, and termination because she opposed discriminatory treatment or complained of discriminatory treatment.

33. As a result of such acts, Plaintiff has suffered damages.

### Prayer for Relief

Wherefore, Plaintiff prays as follows:

A. Issue a declaratory judgment that Defendant's practices toward Plaintiff violated her rights under the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981;

B. Award Plaintiff damages, including back pay, front pay, all lost benefits, reinstatement, restoration of benefits and seniority, compensatory damages for emotional distress and hardship created by the Defendant's discrimination, and punitive damages;

C. Award payment of all fees, costs, and expenses, including attorneys' fees and expert fees;

D. Award Plaintiff such other relief as the Court may deem just and proper.

### Jury Trial Demand

Plaintiff demands a jury trial on all counts so triable.

Respectfully submitted,

_____
Christopher R. Shiplett, Esq.
Randolph Law, PLLC
PO Box 50752
Arlington, VA 22205
(703) 652-3039 phone
(703) 852-3976 fax
chris.shiplett@randolphlawonline.com

*Attorney for Plaintiff*